# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

RONNIE L. FAMOUS,

        Plaintiff,

      -vs-                        Case No. 13-CV-195

DOE ZOHIA, RICHARD HEIDORN,
DOE WATERFORD, JANE DOE NURSE
ANDREW KESSLER, KATHY BRESTER,
MICHAEL BAENEN, JEANANNE ZWIERS,
DAVE BURNETT, JAMES RICHTER,
and ESTATE OF JAMES WONG,

        Defendants.[1]

# DECISION AND ORDER

The pro se plaintiff, Ronnie L. Famous, is a Wisconsin state prisoner. He filed this civil rights action pursuant to 42 U.S.C. § 1983 and was granted leave to proceed *in forma pauperis* on an Eighth Amendment deliberate indifference to a serious medical need claim and a state law negligence claim based on allegations that nurses, doctors, and health care administrators at Green Bay Correctional Institution (GBCI) and the Wisconsin Resource Center (WRC) failed to provide adequate medical treatment for a serious, long-lasting eye infection.[2] This matter is before the Court on the defendants'

---

[1] Defendants Doe Zohia, Doe Waterford, and Jane Doe Nurse have not been identified or served. Thus, the Court will dismiss them.

[2] The plaintiff filed this case in the Western District of Wisconsin. The case was

motions for summary judgment. The motions are unopposed. For the reasons explained herein, the Court will grant the defendants' motions for summary judgment and dismiss this case.

## I. PRELIMINARY MATTER

On June 25, 2015, the Court denied the plaintiff's motion to appoint new pro bono counsel. (Dkt. No. 95.) The Court advised the plaintiff that he should inform the Court by July 6, 2015, whether he still wanted his pro bono attorney to respond to the defendants' motions for summary judgment.[3] The Court also advised the plaintiff that, whether or not he wanted his attorney to file a response, as previously discussed at the May 20, 2015, telephonic status conference, the plaintiff's response was due by July 20, 2015, and that no further extensions would be granted. The Court also stated as follows:

> In this case, the plaintiff charges that Attorney Newbold has not done anything on his case. Attorney Newbold denies that (as does counsel for defendant Dr. Richter). At the May 20, 2015, telephonic status conference, Attorney Newbold stated that he and the plaintiff had a fundamental disagreement about the way to proceed in the case, specifically with regard to his response to the defendants' motions for summary judgment. Attorney Newbold also disagreed with the plaintiff's contention that he did not conduct discovery and stated that he had the plaintiff's medical record which he had presented to the plaintiff. The Court recommended that the plaintiff let Attorney Newbold respond to summary judgment for him, and Attorney Newbold agreed to do so. The Court also stated that the plaintiff could file his own summary judgment response if he wanted. Additionally, the Court advised the plaintiff that it would not recruit another attorney to represent him.

transferred to this district on February 20, 2013.

[3] On September 9, 2013, the Court entered an order recruiting Attorney Joseph Newbold to represent the plaintiff pro bono in this matter.

Case 2:13-cv-00195-RTR   Filed 08/18/15   Page 2 of 22   Document 98

Attorney Newbold's representations reveal that his decisions in this case relate to strategy, not lack of diligence. However, it is apparent that Attorney Newbold and the plaintiff disagree on how proceed with this case. Although the Court previously encouraged the plaintiff to let Attorney Newbold stay on long enough to respond to summary judgment, the Court will not force the plaintiff (or Attorney Newbold) to do so. Currently, the Court's order of May 20, 2015, that Attorney Newbold respond to summary judgment by July 20, 2015, is in effect. If the plaintiff does not want Attorney Newbold to file a response to summary judgment, he should inform the Court by July 6, 2015, and the Court will then grant Attorney Newbold's motion to withdraw. However, the plaintiff is advised that the Court is unable to recruit a new *pro bono* attorney to represent him.

The parties are reminded that the plaintiff's response to the defendants' motions for summary judgment is due by July 20, 2015, and the defendants' replies are due by August 3, 2015. These deadlines remain in effect whether or not Attorney Newbold stays on the case. No further extensions will be granted.

(Dkt. No. 95 at 4-6) (footnotes omitted).

The plaintiff has not notified the Court whether he wants Attorney Newbold to respond to the defendants' motions for summary judgment. On July 20, 2015, Attorney Newbold filed a letter informing the Court that the plaintiff had instructed him not file a response to the defendants' motions for summary judgment. The letter also states the plaintiff did not intend to file his own response to the motions for summary judgment. (Dkt. No. 96.) Based on the foregoing, Attorney Joseph Newbold's motion to withdraw as attorney will be granted.

## II. SUMMARY JUDGMENT STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that

- 3 -

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

### III. FACTS

**A. Dr. Richter's Facts**

- 4 -

Dr. Richter has been a licensed optometrist in the State of Wisconsin since 1972 and has provided optometry care to inmates in correctional facilities throughout northeast and north central Wisconsin. In the course of Dr. Richter's work with the Wisconsin Department of Corrections (DOC), he saw the plaintiff as a patient on three occasions, June 28, 2008, August 8, 2008, and February 8, 2012.

The plaintiff had been diagnosed with meibomianitis at least back to the year 2000, as well as blepharitis on various occasions, before Dr. Richter first saw him as a patient on June 28, 2008. Dr. Richter has experience with diagnosing and treating meibomianitis (meibomian and glandular dysfunction), which is an inflammation of the meibomian glands, a group of oil secreting (sebaceous) glands that have tiny openings to release oils into the surface of the cornea. In meibomianitis, these glands become inflamed, with the otherwise normal secretion turning a thick yellow, which causes dry eye symptoms. Meibomianitis is frequently associated with blepharitis, which is a flaky collection on the eyelashes, and is the result of staph bacterial exotoxins.

It has been Dr. Richter's education and experience that neither meibomianitis nor blepharitis result in a loss of vision, other than potential intermittent short term blurring, but both conditions can be troublesome, chronic problems which may require, on and off, lifetime attention, medication and treatment to address the symptoms. Appropriate treatment for these

- 5 -

conditions can involve medication, such as TobraDex (antibiotic/steroid combination), eyelid scrubs with baby shampoo, warm compresses, and use of artificial tears for dry eye symptomatology.

At no point during Dr. Richter's treatment of the plaintiff, or for that matter anywhere else in the plaintiff's treatments by anyone else either inside or outside the DOC health care system, was there any indication that the plaintiff ever lost any visual acuity, suffered any serious medical condition as a result of his symptomatology but, rather, continued to complain of chronic, ongoing symptomatology consistent with meibomianitis and blepharitis. The records from UW Hospital Eye Clinic reveal that those eye specialists came up with the same diagnoses and recommended treatments, with regard to the plaintiff and meibomianitis and blepharitis, as did Dr. Richter.

In Dr. Richter's personal visits and treatments with the plaintiff, based upon his recurring complaints that he felt like he had a foreign body or object in his eyes, Dr. Richter carefully examined him and never found any such foreign object or body in his eyes. Nor does a review of the available outside health care provider records or other records from the DOC reveal that any other health care provider, be it an optometrist or medical doctor, has ever found any foreign object or body in the plaintiff's eyes. During Dr. Richter's examinations of the plaintiff, his vision was always considered to be within the normal range, typically in the 20/20 - 20/25 range. There is no evidence in

- 6 -

the record that either the meibomianitis or blepharitis ever affected his vision negatively despite their chronic nature.

On June 28, 2008, Dr. Richter's first visit with and treatment of the plaintiff, his chief complaint was a yellowish discharge at times. Dr. Richter diagnosed meibomianitis, he prescribed TobraDex, warm compresses twice a day for twenty minutes, and directed that the patient follow-up with him.

Dr. Richter next saw the plaintiff on August 8, 2008, at which point he sat down with the plaintiff and re-explained the diagnosis, care, and treatment plan and the reasons for the care recommended. On that date, Dr. Richter also observed that the plaintiff's pre-existing chart showed that his cup/disk ratios with regard to his optic nerves were larger than optimum, so Dr. Richter wrote an order to return to him in six weeks for an eye pressure check with follow-up and progress. However, the plaintiff did not meet that appointment.

The records in this case indicate that one of the DOC staff physicians attempted to send the plaintiff back to UW Eye Clinic on September 10, 2008, based upon a previous recommendation from a February 6, 2008, visit to UW Eye Clinic with regard to the above-referenced cup/disk ratio and the fact that the plaintiff was glaucoma suspect. However, on the morning of September 10, 2008, the plaintiff refused to go to that appointment. A review of the records indicates that on July 19, 2010, he again refused a referral to UW due

- 7 -

to the glaucoma suspect concern.

Dr. Richter's final personal visit/treatment with the plaintiff was on February 8, 2012, at GBCI; the primary incoming complaint was that the plaintiff indicated he felt he had a foreign body sensation in his left eye at times, which would come and go. The plaintiff complained of no itch, no green or yellow discharge, although he had a slight whitish discharge from one eye, and he appeared to be negative from an allergy, bacterial, and viral standpoint. Dr. Richter concluded that he had conjunctival crustacean/concretion in the inferior and superior area under the lid and he prescribed a mild Prednisone-type solution, to be targeted over time, along with artificial tears and warm compresses. On that date, Dr. Richter observed, through the use of a fluorescein dye test, which is completely harmless and painless, that the plaintiff had mild dryness of his cornea, demonstrated by light corneal stain, which is consistent with both meibomianitis and blepharitis. Accordingly, he wrote an order for artificial tears for each eye as needed for six months, with that medication being renewed on March 15, 2012.

The records in this case indicate that the plaintiff has been seen by physicians and optometrists with similar problems and diagnoses (meibomianitis and blepharitis), with recommended similar treatments as far back as June 2000, and continuing on beyond Dr. Richter's three in-person

- 8 -

treatments with the plaintiff.

As an example of a prior treatment of this nature, the plaintiff presented to the optometric clinic at GBCI with similar complaints on January 30, 2006, and was again informed that he had meibomianitis and blepharitis in both eyes, along with concretions and conjunctivitis in both eyes, and he was again advised to use a lid scrub with Johnson & Johnson baby shampoo and warm compresses. On that date, he also refused an ophthalmoscope evaluation, which is designed to examine interior eye health. Thereafter, on March 14, 2006, the records reflect resolving mild blepharitis, better than the prior year, although the patient wanted a second opinion regarding his eye conditions, which appears to have been scheduled for August 2006, with the patient refusing the actual appointment with UW Eye Clinic when that date arrived.

Thereafter, on November 30, 2007, the plaintiff again presented to the DOC optometric department with the complaint of eye infection in both eyes with a "pus buildup" in the eyes, and Dr. Wall's assessment was conjunctivitis in both eyes, and the plaintiff was prescribed Tobramycin three time a day for seven days, and he was again referred to UW Eye Clinic for a glaucoma suspect workup.

Thereafter, on February 6, 2008, the plaintiff saw UW Health Ophthalmology (Daniel W. Knoch, M.D.), presenting with a history of seeing

- 9 -

optometry back on November 30, 2007, and being diagnosed with conjunctivitis and a history of being glaucoma suspect. At UW, the patient again complained of a foreign body sensation in the right eye, which moved around. Dr. Knoch's examination that day revealed visual acuity of 20/25 in the right eye and 20/20 in the left eye, without glasses, and demonstrated intraocular pressure of 19 on the right and 17 on the left, with meibomian gland dysfunction and blepharitis bilaterally. Based on this examination, Dr. Knoch's assessment was that the plaintiff had a moderate suspicion of glaucoma and he wanted him to return to UW in approximately 4-6 weeks' time for follow-up testing of the type that Dr. Richter similarly recommended when he eventually saw him. It appears that the plaintiff did go back to UW Eye Clinic on March 27, 2008, for such testing.

The record indicates that there is a Psychological Service Request record dated April 4, 2012, directed to Dr. Olbinski which, among other things, references the "harmful eye drops" that Dr. Richter "intentionally put into" the plaintiff's eyes on February 8, 2012. In this respect, the record does not indicate that any eye drops were put into the plaintiff's eyes on that date by Dr. Richter but, instead, a mild Prednisone-type treatment along with artificial tears was prescribed. The only "drops" that were administered to the plaintiff on February 8, 2012, was the fluorescein dye test for dryness, which is painless, simple, routinely used, and is in no way harmful to the eye.

The records and evidence developed to date in this case reveal that at no point during Dr. Richter's treatments of and visits with the plaintiff did any of his conditions equate to any sort of emergency. Rather, his conditions of meibomianitis and blepharitis were chronic and recurring, which typically require diligent self-care by the patient, such as warm compresses, lid scrubs and improved eye hygiene, and compliance with suggested eye medication regimens. While the concretions which can occur with these conditions are not foreign bodies, the presence of these concretions can make it feel as if the patient has something in his eye(s).

The record in this case reveals that the plaintiff has had regular, frequent and continual responsive medical care both within the DOC and, when appropriate, with outside experts and health care providers with respect to any and all of his eye concerns, although he has not always accepted recommendations of referrals. With regard to the plaintiff's allegation that Dr. Richter was deliberately indifferent to his serious health concerns, a review of his entire record reveals that there is no evidence of any such alleged deliberate indifference, there is no evidence that anything Dr. Richter did or did not do in providing treatment or care to the plaintiff in anyway aggravated, exacerbated or accelerated his longstanding, pre-existing chronic conditions, and in fact Dr. Richter's treatments of those symptoms and conditions were entirely appropriate.

- 11 -

Additionally, the record appears clear that with regard to the plaintiff's allegation of deliberate indifference as against Dr. Richter or anyone else associated with the HSU and/or DOC, the plaintiff has never been denied any requested appointments, follow-up care, or referrals (although referrals were often rejected), his eye complaints all match his diagnosed conditions symptomatically, he does not and has not had any acute eye illnesses, he has been seen by multiple eye care specialists, all of whom agree on these diagnoses of meibomianitis and blepharitis, he has had these diagnoses, treatment plans and concepts explained to him on multiple occasions, and he has been provided with the proper medications and course of treatments on a timely basis.

## B. State Defendants' Facts

### 1. Dr. Richard Heidorn

Dr. Heidorn is a physician. He was employed by the DOC Bureau of Health Services (BHS) in the Health Services Unit (HSU) at GBCI from May 2004, through October of 2012.

The plaintiff alleges that in 2006 he saw Dr. Zohia about his complaint that he had a discharge of yellow pus and a foreign object in his eyes. Zohia prescribed an eye wash, and sought a referral to the UW Madison eye clinic regarding the pus discharge. The plaintiff alleges that Dr. Heidorn cancelled an appointment to the eye clinic that Zohia had made for the plaintiff. The

- 12 -

plaintiff further alleges that Dr. Heidorn subsequently examined him, and during that examination intentionally pretended that he did not see the pus. The plaintiff further alleges that Dr. Heidorn did not do anything about the foreign object in his eye.

On March 14, 2006, Dr. Zohia requested a referral for the plaintiff to be seen at UW Eye Clinic. Dr. Zohia was a contracted physician, not employed by the DOC. Dr. Heidorn wrote an order on July 26, 2006, to schedule the plaintiff for an evaluation to take place on August 8, 2006, to determine if he met the criteria for a consultation with an eye specialist at UW Eye Clinic. The HSU inadvertently scheduled the plaintiff for a blood pressure check instead of an evaluation of his eye condition.

The plaintiff refused to be seen on August 8, 2006, and signed a refusal on August 9, 2006, because he thought the appointment was for a blood pressure check. Due to the plaintiff's refusal, Dr. Heidorn cancelled his July 26, 2006, order for an eye evaluation on August 8, 2006; he thought the plaintiff was refusing the eye evaluation needed before referring him to the UW Eye Clinic. Had the plaintiff come for the appointment and told Dr. Heidorn that he didn't want his blood pressure checked but wanted care for his eyes, Dr. Heidorn would have evaluated his eyes as he requested.

Dr. Heidorn examined the plaintiff on December 7, 2006, to determine if he met the criteria to be referred to the UW Eye Clinic. The plaintiff's eye

- 13 -

exam was normal on this date and was also confirmed by Nurse Kathy Lemens, and Nurse Jeananne Greenwood (now known as Jeannanne Zwiers). The plaintiff did not meet the criteria for a referral at that time.

### 2. Dr. Andrew Kessler

Dr. Kessler is a licensed physician in the State of Wisconsin, practicing in the field of psychiatry. He has been licensed in the State of Wisconsin continuously since October 25, 1985. Dr. Kessler was employed as a psychiatrist by the Wisconsin Department of Health Services from August 2005, until August 2010. During his employment, Dr. Kessler worked as one of the psychiatrists at WRC.

The plaintiff alleges that Dr. Kessler examined him at the WRC on January 27, 2010. The plaintiff alleges that he showed Dr. Kessler yellow pus in his eyes and showed Dr. Kessler a foreign object in his eyes. He further alleges that Dr. Kessler refused to acknowledge the yellow pus, and refused to remove the foreign object from his eyes.

Dr. Kessler met with the plaintiff on two occasions at WRC. He saw the plaintiff on January 27, 2010, upon his admission. During that visit, Dr. Kessler referred the plaintiff to ophthalmology for a glaucoma examination. Dr. Kessler's examination on March 26, 2010, was for the purpose of treating the plaintiff's psychological issues. The plaintiff did not raise any concerns about his eyes at that visit.

- 14 -

### 3. Nurse Kathleen Brester

Nurse Brester is a registered nurse. In March 2010, she was employed at the WRC.

The plaintiff alleges that he sought treatment for his eyes on March 2, 2010, but that Ms. Brester ignored him and refused to acknowledge the yellow pus in his eyes.

The plaintiff submitted a Health Service Request (HSR) on March 14, 2010, to be seen for "a drainage of pus that is build-up in both of my eye lids." Nurse Brester subsequently saw the plaintiff and communicated to him that he had an upcoming eye appointment in the near future to address his concerns. Nurse Brester next saw the plaintiff on March 21, 2010. At that visit, the plaintiff complained of drainage of pus that built up in both eye lids. Nurse Brester noted no drainage, no change in vision, no pain, no edema, and that his sclera was white. There were no indications that the plaintiff was suffering from an eye infection on this date of treatment. It was also noted that he had a follow-up eye appointment scheduled with the UW Eye Clinic at the end of March, 2010.

### 4. Jeananne Zwiers

Ms. Zwiers is employed by the DOC as GBCI's Health Services Unit (HSU) Manager.

The plaintiff alleges that Jeananne Zwiers participated in an eye exam

that Dr. Heidorn was conducting. He alleges that she came by, and without any examination, denied that he had anything in his eye.

On December 7, 2006, Ms. Zwiers observed the plaintiff's eyes at the request of Dr. Heidorn and the plaintiff. (In the relevant medical note, Zwiers is identified by her maiden name of Jeananne Greenwood.) Dr. Heidorn noted that there was no pus and no crusting in the plaintiff's eyes or redness of the sclera (the white portion of the eye). Dr. Heidorn noted a normal eye exam, with which Ms. Zwiers concurred.

### 5. Michael Baenen

Baenen was GBCI's warden from March 2011, to March 2014. When an inmate sent Baenen correspondence, it was his practice to respond to the inmate, take any action that was needed, and make sure that his responsive correspondence became part of the inmate's medical chart or was retained in the Inmate Complaint Review System (ICRS), dependent upon the nature of the issue.

The plaintiff alleges that Baenen refused to rectify the problems the plaintiff was having with the medical staff, even after he notified Baenen of these problems through grievances, letters, and other means.

Baenen no longer has personal access to his prior records and security files. However, in conjunction with this lawsuit, GBCI staff searched Baenen's former records to determine if during his tenure as Warden, he had

- 16 -

received any information from the plaintiff concerning his complaints of inadequate medical care by GBCI staff for his alleged eye infections. No correspondence by the plaintiff was found in the records of the Warden's office or in the medical record maintained in the HSU. Based on that information, it is Baenen's understanding that while he was Warden he did not receive any letters from the plaintiff regarding his eye concerns.

### 6. Dr. David Burnett

Dr. Burnett was employed as the medical director for the Bureau of Health Services (BHS) at the DOC from 2001 to 2013. BHS is the DOC agency responsible for providing health care services to inmates confined in DOC's adult institutions, including GBCI. Dr. Burnett never personally treated the plaintiff for his eye concerns.

The plaintiff alleges that Dr. Burnett refused to rectify the problems he was having with the medical staff, even after the plaintiff notified him of these problems through grievances, letters and other means.

The plaintiff wrote a letter on February 27, 2012, to the BHS. A search at GBCI and at BHS has failed to produce a copy of that letter. Dr. Burnett's response, dated February 28, 2012, directed the plaintiff to file his complaint through the ICRS. This was Dr. Burnett's only involvement with the plaintiff's medical care. The plaintiff did file an offender complaint. His complaint was eventually dismissed because it was documented that he had

- 17 -

received appropriate care for his eye concerns

## III. DISCUSSION

**A. Eighth Amendment Law**

"The Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (quoting *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009); *see also Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs. *Arnett*, 658 F.3d at 750 (citing *Estelle*, 429 U.S. at 104). Accordingly, a claim based on deficient medical care must demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition. *Arnett*, 658 F.3d at 750 (citation omitted).

"Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez*, 577 F.3d at 828 (quoting *Estelle*, 429 U.S. at 104). Deliberate indifference occurs when a defendant realizes that a substantial risk of serious harm to a prisoner exits, but then disregards that risk. *Perez v. Fenoglio*, 2015 WL 4092294, at *3 (7th Cir. July 7, 2015) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (plaintiff must show that officials are

- 18 -

"aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must also draw the inference")).

> Prison officials must provide inmates with medical care that is adequate in light of the severity of the condition and professional norms. *See, e.g., Farmer,* 511 U.S. at 832, 114 S.Ct. 1970; *Arnett,* 658 F.3d at 751. The "receipt of some medical care does not automatically defeat a claim of deliberate indifference." *Edwards,* 478 F.3d at 831; *see also Arnett,* 658 F.3d at 751 (prisoner need not show that his or her medical needs were "literally ignored"). Deliberate indifference may occur where a prison official, having knowledge of a significant risk to inmate health or safety, administers "blatantly inappropriate" medical treatment, *Edwards,* 478 F.3d at 831, acts in a manner contrary to the recommendation of specialists, *Arnett,* 658 F.3d at 753, or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering. *McGowan v. Hulick,* 612 F.3d 636, 640 (7th Cir. 2010).

*Perez*, 2015 WL 4092294, at *4.

## B. Discussion

The undisputed facts do not support a finding that any defendant acted with deliberate indifference toward the plaintiff's medical needs. Rather, the record reflects that he received appropriate treatment for his eye conditions from DOC medical professionals and non-DOC medical professionals. It is undisputed that the non-medical professional defendants lacked personal involvement in the plaintiff's claims. Accordingly, the Court will grant the defendants' motions for summary judgment as to the plaintiff's Eighth Amendment claim.

In the absence of any surviving federal claim, this Court declines

exercise supplemental jurisdiction over the plaintiff's state law claim.  *See* 28 U.S.C. § 1367(c); *Carlsbad Technology, Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009).

## C.  Defendant Estate of James Wong

Defendant Estate of James Wong has not been served.[4]  The plaintiff alleges that in 2000 defendant Wong took an eye culture which came back positive for three different types of "bacteria infectious organisms."  (Compl. ¶ 29.)  The plaintiff further alleges that Wong never told him about the infection or test results, and that the plaintiff was not treated for the infection until three years later.  (*Id.*)

Federal Rule of Civil Procedure 25(a)(1) governs substitution of parties. It provides, in relevant part, "If a party dies and the claim is not extinguished, the court may order substitution of the proper party."  Fed. R. Civ. P. 25(a)(1). However, when a person for whom substitution is sought has died before being named a party, substitution is not allowed.  *Mizukami v. Buras*, 419 F.2d 1319, 1320 (5th Cir. 1969); accord *Davis v. Cadwell*, 94 F.R.D. 306, 307 (D. Del. 1982).

It appears from an obituary that Dr. James Wong died on May 17,

_____

[4] On February 16, 2012, Magistrate Judge Crocker granted the plaintiff's motion to substitute the Estate of James Wong as party for Dr. James Wong, who was deceased.  (Dkt. No. 25.)  Magistrate Judge Crocker also ordered that the Court could issue an order for service on the estate at a later time, if necessary.  *Id.*

- 20 -

2008,[5] and the plaintiff did not file his complaint until February 29, 2012. Thus, the plaintiff could not substitute Dr. Wong's estate (if there is one) because Dr. Wong was never a proper party to this action.

Even if Dr. Wong was a proper party, the plaintiff's claim against him would be barred by Wisconsin's six-year personal rights statute of limitations, Wis. Stat. § 893.53, the residual statute for personal-injury actions, which is used for § 1983 actions in Wisconsin. *See Givens v. Luedtke*, 587 Fed. Appx. 979, 981 (7th Cir. 2014) (citing *Malone v. Corr. Corp. of Am.*, 553 F.3d 540, 542 (7th Cir. 2009); *Gray v. Lacke*, 885 F.2d 399, 407-09 (7th Cir 1989)).

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT** defendant Richter's motion for summary judgment (ECF No. 66) is **GRANTED**.

**IT IS FURTHER ORDERED** that defendants Baenen, Brester, Burnett, Heidorn, Kessler, and Zwiers' motion for summary judgment (ECF No. 71) is **GRANTED**.

**IT IS FURTHER ORDERED** that the plaintiff's motion to withdraw as attorney (ECF No. 86) is **GRANTED**.

**IT IS FURTHER ORDERED** that defendants Doe Zohia, Doe Waterford, Jane Doe Nurse, and Estate of James Wong are **DISMISSED**.

---

[5] *See* http://proko-wall.i-lived.com/obituary/05-17-2008/Dr-James-Wong/, (last visited August 14, 2015).

- 21 -

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment dismissing the plaintiff's claims and this action.

Dated at Milwaukee, Wisconsin, this 18th day of August, 2015.

**BY THE COURT:**

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**